Bradley L. Booke #5-1676
LAW OFFICE OF BRADLEY L. BOOKE
Box 13160
Jackson, Wyoming 83001
702-241-1631
866-297-4863 fax
brad.booke@lawbooke.com

Raeesabbas Mohamed, Esq. (AZ Bar # 027418)
**RM WARNER, PLC**
Applicant *pro hac vice*
8283 N. Hayden Road, Suite 229
Scottsdale, Arizona 85258
Email: Raees@rmwarnerlaw.com
Tel: 480-331-9397
Fax: 1-866-961-4984
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF WYOMING

| | |
|---|---|
| TAN BOON KIAT, a.k.a. STEVE TAN, AS INDIVIDUAL; | |
| Plaintiff, | Case No. 1:25-cv-214 |
| V. | |
| LUCAS EMANUEL URIA THEIS, a.k.a. LUKE BELMAR, AS INDIVIDUAL; LARA ELYSE URIA THEIS, AS INDIVIDUAL; CAPITAL CLUB LLC, A WYOMING LIMITED LIABILITY COMPANY; | **COMPLAINT** |
| Defendants. | |

For his complaint against Defendants captioned above, Plaintiff alleges as follows:

**I.     Introduction**

1.      This action arises from a calculated scheme by Defendants Luke Belmar and Lara Belmar to defraud, deceive, and oust Plaintiff Tan Boon Kiat, a.k.a. Steve Tan from the very business he co-founded, funded, and built: Capital Club. Plaintiff invested more than $4 million, drawn from Capital Club's operating revenue and reinvested into the company's infrastructure,

1

team, and customer base. He also devoted years of effort to building and growing the business. In return, Defendants promised to buy out his interest, but instead exploited that promise to seize control of company operations, reroute millions in revenue, and launch a directly competing venture, Gem Hunters, using Plaintiff's work and resources.

2.     Defendants' conduct, including false promises, unauthorized account removals, hidden transfers through crypto wallets, and financial diversion, violates the core duties owed between business partners and co-owners.

3.     Their actions constitute fraudulent inducement, conversion, breach of fiduciary duty, unjust enrichment, and civil conspiracy.

4.     Plaintiff brings this action to recover the substantial losses he has sustained, to expose the full scope of Defendants' misconduct, and to make clear that fraud, self-dealing, and abuse of trust in business partnerships will not be tolerated.

**II.     Parties**

5.     Plaintiff Tan Boon Kiat a.k.a. Steve Tan ("Mr. Tan") is an individual domiciled in Singapore.

6.     Defendant Lucas Emanuel Uria Theis, better known by his online name, Luke Belmar, ("Defendant Luke") is an individual residing in Puerto Rico or Florida.

7.     Defendant Lara Elyse Uria Theis ("Defendant Lara") is the spouse of Defendant Luke and is named in this lawsuit to provide full notice to the marital community. Upon information and belief, Defendant Lara is the "apparent owner" of Capital Club LLC with a management role as Chief of Staff at Capital Club LLC. Upon information and belief, all actions taken by Defendant Lara were for the benefit of the marital community. Defendants Luke and Lara are collectively herein referred to as "Defendants" or "Defendants Luke and Lara."

8.     Capital Club LLC is a Wyoming limited liability company, originally organized by Defendant Luke who then transferred ownership to Defendant Lara and operated as a financial conduit for business activities conducted by Defendants Luke and Lara.

**III.     Jurisdiction**

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2)

because there is diversity of citizenship between all plaintiffs and all defendants, including the members of the defendant limited liability company: Plaintiff is a citizen of Singapore; the individual Defendants are citizens of a U.S. state or territory; the members of the limited liability company Defendant are citizens of a U.S. state or territory; and the amount in controversy exceeds $75,000.

10.     This Court has supplemental jurisdiction over the supplemental state law claims pursuant to 28 U.S.C. § 1367(a) because the claim arises out of the same common nucleus of operative facts as the federal securities fraud claim.

11.     This Court has personal jurisdiction over Defendant Capital Club LLC because it is a Wyoming limited liability company organized and existing under Wyoming law.

12.     This Court also has personal jurisdiction over Defendant Luke and Defendant Lara because they purposefully directed their conduct toward and through Capital Club LLC, which they dominated and controlled as their alter ego. Defendants used the Wyoming entity to perpetrate fraud, misappropriate assets, and injure Plaintiff. Accordingly, jurisdiction over both individual Defendants is proper under veil piercing and alter ego principles.

**IV.     Venue**

13.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because Defendant Capital Club LLC is incorporated in Wyoming and a substantial part of the events or omissions giving rise to the claim occurred or are located in Wyoming.

**V.     Factual Allegations**

14.     All of the allegations contained within the paragraphs above and below are hereby incorporated by reference as if fully set out herein.

**Unstable Foundations with Defendant Luke.**

15.     In 2018, Defendant Luke messaged Mr. Tan directly via social media to help Mr. Tan with social media personal brand growth.

16.     At its core, a social media "brand" is the online identity and reputation of an individual or company across digital platforms such as Instagram, YouTube, TikTok, and X (formerly Twitter). Building a social media brand requires consistent content creation, audience

1    engagement, and marketing strategies designed to attract followers and convert them into paying

2    customers or members of an online community. In the digital economy, social media influence

3    directly translates to business opportunities, sponsorships, and revenue streams.

4         17.    Mr. Tan would not realize until much later that Defendant Luke's touted success in

5    brand growth[1] merely consisted of buying fake bot followers for Mr. Tan's accounts,

6    foreshadowing the smoke and mirrors Defendant Luke would use over Mr. Tan throughout their

7    friendship.

8         18.    Over the next few years, Mr. Tan provided substantial mentorship and business

9    support to Defendant Luke, including free access to high-level mastermind events in Phuket,

10   Thailand and Singapore, and even hosting Defendant Luke in his own home for weeks at a time.

11        19.    While taking advantage of Mr. Tan's support, Defendant Luke cultivated an online

12   persona portraying himself as a successful entrepreneur who had earned tens of millions of dollars

13   through e-commerce and cryptocurrency.

14        20.    Cryptocurrency and blockchain-based projects, which Defendants frequently

15   promoted, rely heavily on social media marketing and credibility. A large following and perceived

16   authority online enable individuals to attract investors, sell memberships, and market products or

17   services on a global scale.

18        21.    Thus, Defendant Luke's development of his online presence was not a matter of

19   casual vanity, but rather the creation of a monetizable business asset that was integral to the parties'

20   enterprise.

21        22.    On or about June 5, 2020, Defendant Luke published a press release and

22   accompanying marketing campaign that falsely portrayed Mr. Tan as his business partner.

23        23.    At that time, Mr. Tan was not Luke's partner in any capacity. This was a deliberate

24   misrepresentation designed to unlawfully associate Mr. Tan's reputation, credibility, and goodwill

25   with Luke's venture, without Mr. Tan's knowledge, consent, or authorization.

26        24.    Mr. Tan later came to understand that many of these claims were exaggerated or

27   false, made to create the illusion of business success and Defendant Luke's own personal success,

28

---

[1] https://finance.yahoo.com/news/top-10-ecom-entrepreneurs-helping-080000068.html

1  as demonstrated by the motto Defendant Luke lived by: "fake it 'til you make it."

2      **Mr. Tan's Development and Growth of Capital Club and CCIL.**

3      25.    In May 2022, Mr. Tan and Defendant Luke formally agreed to co-found Capital

4  Club, a business focused on digital entrepreneurship, education, and community-building.

5      26.    Capital Club is an online membership-based business community that markets itself

6  as a "global entrepreneurial society." Members pay subscription fees in exchange for access to

7  online courses, mentorship programs, networking opportunities, and exclusive digital content

8  focused on entrepreneurship, investing, opportunities to invest in cryptocurrencies and stock picks,

9  and financial independence. The company also organizes events, produces educational media, and

10  sells access to groups that promise to help members grow businesses and build wealth.

11      27.    The success of Capital Club depends directly on its ability to attract large numbers

12  of paying members through online marketing, content distribution, and the personal branding of

13  its founders.

14      28.    Mr. Tan was the CEO and operational partner, overseeing execution, hiring,

15  systems development, marketing, and day-to-day management. Defendant Luke assumed a more

16  front-facing role in branding and public communications.

17      29.    Initially, the parties used a Wyoming limited liability company, Capital Club LLC

18  ("Capital Club"), to facilitate operations. However, the following year they agreed that Mr. Tan's

19  Hong Kong entity, CC International Limited ("CCIL"), would be the designated parent company

20  and central financial repository. Defendant Luke acknowledged and supported this restructuring.

21      30.    Mr. Tan invested more than $4.15 million into the business, including over $3.1

22  million for media, marketing, infrastructure, and events, nearly $1 million in payroll, and

23  $340,000+ worth of interest-free loans to the business.

24      31.    Mr. Tan's capital and operational involvement were foundational to Capital Club's

25  rapid growth and success.

26      32.    When Capital Club first opened for selling an annual membership to the public in

27  October 2023, Capital Club generated more than $2.2 million in revenue. With subsequent sales

28  in November and December, the business grossed over $4.2 million in three months.

1       33.     Over the course of two years, Mr. Tan and his team built Defendant Luke's personal

2  brand to unprecedented levels, including the use of Mr. Tan's personal resources and connections

3  to provide Luke with unique interview and podcast opportunities, and generating over 10 million

4  social media followers across multiple platforms and more than 2 billion content views. Defendant

5  Luke's personal Instagram account grew from approximately 41,000 followers to over 685,000

6  followers, and his X account expanded from zero to over 700,000 followers.

7       34.     These achievements were the direct result of company funded initiatives, strategic

8  content production, and marketing systems created by Mr. Tan.

9       35.     Mr. Tan even used his personal resources and connections to get Luke onto

10  different podcasts and interviews.

11       36.     Defendant Luke then leveraged this influence, built entirely on Capital Club's

12  resources and at Mr. Tan's expense, to secure deals, partnerships, and opportunities for his own

13  benefit while cutting Mr. Tan out of any share in the resulting revenue or relationships.

14       37.     These results were made possible by the infrastructure, personnel, and systems that

15  Mr. Tan had financed and built.

16       38.     Essentially, Mr. Tan contributed deep operational expertise, strategic planning

17  systems, ambassador recruitment formulas, proprietary mass content distribution processes,

18  framework, and strategies that formed the core of Capital Club's growth engine. These resources

19  were derived from his years of experience in entrepreneurship, marketing, and digital

20  infrastructure.

21       **Defendant Luke's Competing Business Gem Hunters.**

22       39.     While still operating as Mr. Tan's business partner in Capital Club, Defendant Luke

23  began developing a    competing Internet-based business offering called Gem Hunters.

24       40.     Gem Hunters is a subscription-based online membership community marketed as

25  an investment and wealth-building society. Members pay recurring fees in exchange for access to

26  information about stock picks, cryptocurrency projects, and other speculative investments that

27  Defendants promoted as "hidden gems."

28       41.     Like Capital Club, Gem Hunters relies heavily on online marketing, the personal

1    branding of Defendant Luke, and promises of insider access to financial strategies.

2    42.    The business model is identical to Capital Club's: it generates revenue primarily

3    from subscription memberships and upselling additional courses or services, all built on the same

4    audience, systems, and staff that Plaintiff had already developed and funded.

5    43.    Without disclosing this to Mr. Tan, Defendant Luke used Capital Club's intellectual

6    property, marketing assets, and personnel to build out this separate enterprise.

7    44.    Defendant Luke recruited Capital Club employees and contractors under the pretext

8    of a "restructuring" back to the United States, when in fact he was shifting them into a parallel

9    operation under his exclusive control. This new Gem Hunters business is operated through DBH

10    Digital LLC, an entity Defendant Luke owns and controls.

11    45.    In furtherance of this scheme, Defendant Luke directed Capital Club employees

12    and course experts (i.e., subject matter experts) to sign new contracts under a Puerto Rico-based

13    entity he controlled called CC X LLC. This maneuver allowed him to reassign employment and

14    contractual rights away from Capital Club and into his new competing business structure.

15    46.    Defendant Luke used this tactic to transfer ownership of course content, intellectual

16    property, and personnel. These resources had been fully developed and funded by Plaintiff's Hong

17    Kong company and were wrongfully diverted for Defendants' exclusive benefit.

18    47.    In less than a year, Gem Hunters extraordinarily grew to over 2,500 paying

19    members, generating approximately $10 million in subscription revenue.

20    48.    Upon information and belief, 80 to 90 percent of Gem Hunters members may have

21    originated from the Capital Club ecosystem just based on overlap.

22    49.    Upon information and belief, Defendant Luke has derived over $15 million in

23    profits from this competing venture, a clear violation of the basic fiduciary duties of partnership.

24    **Defendant Luke's False Promise of a Buyout and Mr. Tan's Handover of Control to**

25    **Defendants Luke and Lara.**

26    50.    In late 2024, Mr. Tan indicated that he wanted to leave the partnership. Defendant

27    Luke agreed to buy out Mr. Tan's interest in Capital Club if Mr. Tan transferred everything over

28    to him, thus they both agreed upon an initial term sheet for the buyout offer.

1    51.    Defendant Luke represented that Mr. Tan would be compensated in full if Mr. Tan

2  agreed to transfer data baseaccess, administrative-level access log-ins, operational control of the

3  business, proprietary systems, industry-specific know-how, internal playbooks, customer growth

4  engines, and operational workflows that Mr. Tan had personally developed over years of

5  entrepreneurship.

6    52.    "Backend access" and "administrative credentials" refer to the master logins and

7  security keys that allow control over company websites, payment processors, customer databases,

8  email systems, and social media platforms. Whoever holds these credentials controls the flow of

9  revenue, communication with customers, and the company's online presence, making them the

10  digital equivalent of keys to the business itself.

11    53.    In fact, Defendant Luke's plan, intention, goal, and design was to obtain these

12  credentials under false pretenses so that he could seize exclusive control of Capital Club, cut off

13  Mr. Tan's access to the business, and divert its revenues and assets for his own benefit.

14    54.    Relying on Defendant Luke's false assurances, Mr. Tan began to execute a full-

15  scale operational transition in August 2024. This was not just access to critical systems including

16  software infrastructure, customer databases, payment processors, and internal management tools.

17  This was a hands-on, time-intensive transfer of company infrastructure, involving deep

18  coordination across internal systems, finance gateways, team management platforms, and backend

19  communications.

20    55.    Mr. Tan and his team dedicated several months of extensive effort to systematically

21  transition full control of the company's systems to Defendants Luke and Lara. This included

22  compiling secure credential spreadsheets, updating admin hierarchies, providing walkthrough

23  documentation, and transitioning oversight of internal operations to Defendant Luke.

24    56.    Between October 27 and 29, 2024, Defendant Luke intensified his demands,

25  pressuring Mr. Tan to hand over all remaining credentials and controls. Cloaked as a necessity to

26  "finalize the restructuring," this request was, in fact, the final step in a calculated scheme to seize

27  unilateral control of Capital Club.

28    57.    Within days of receiving full access, Defendant Luke locked Mr. Tan out of all core

1  systems by revoking credentials, resetting software permissions, and severing administrative

2  rights, effectively executing a digital coup.

3      58.      This deliberate and premeditated exclusion ensured that Mr. Tan, the company's

4  co-founder and architect, was completely stripped of operational oversight and prevented from

5  safeguarding the business he built.

6      59.      The systematic nature of the handover underscores the deliberate and high-trust

7  nature of Mr. Tan's actions towards his business partner, Defendant Luke, whom Mr. Tan felt he

8  could trust after years of working on this venture.

9      60.      To further reinforce the illusion of a good-faith buyout, Defendant Luke presented

10  a detailed term sheet outlining proposed financial terms, including valuation figures, timelines,

11  and specific deliverables.

12      61.      This term sheet, while never executed, was used strategically as a carrot to induce

13  Plaintiff into transferring control of backend systems, customer data, IP, and operational assets.

14      62.      Defendant Luke repeatedly assured Mr. Tan that the buyout was imminent and

15  merely awaiting legal finalization, citing his attorneys' ongoing review as the reason for delay.

16      63.      In reality, the term sheet served as a manipulative device: a facade of legitimacy

17  designed to exploit Mr. Tan's trust and extract maximum value without committing to any

18  compensation. Defendant Luke used the existence of this document to stall, delay, and ultimately

19  secure full operational control of Capital Club without paying Mr. Tan a single dollar.

20      64.      By the time it became clear that no payment or formal agreement would materialize,

21  Mr. Tan had already surrendered critical infrastructure, internal systems, personnel oversight, and

22  financial pipelines, all in reliance on a false promise memorialized in the term sheet.

23      65.      By June 2025, Defendant Luke's true motives became unmistakably clear: he had

24  never intended to honor the buyout agreement. After months of calculated delay, false

25  reassurances, and strategic manipulation, Luke abruptly reneged on the buyout entirely.

26      66.      What began as a promise of partnership resolution was, in hindsight, a coldly

27  orchestrated scheme to extract the full value of Mr. Tan's contributions while stringing him along

28  with legal-sounding excuses and the illusion of a deal.

67.    Luke's failure to follow through was not a misunderstanding. It was the final act in a months-long campaign of intentional deception, executed only after he had fully extracted the assets, systems, and control necessary to operate Capital Club and Gem Hunters without Mr. Tan's involvement or compensation.

**Defendants Luke and Lara's Exclusion of Mr. Tan and Improper Diversion of Revenue.**

68.    After securing control through misrepresentations, Defendants Luke and Lara acted jointly to exclude Mr. Tan from Capital Club. On September 8, 2024, Defendant Lara unilaterally removed Mr. Tan as the primary administrator of Capital Club's backend systems. Mr. Tan did not discover this until months later.

69.    By October 20, 2024, both Defendants had removed Mr. Tan from internal communications. On October 29, Mr. Tan learned that Defendant Lara had also directed login changes and the revocation of Mr. Tan's credentials. By November 3, Mr. Tan had been removed from all internal WhatsApp channels. On November 6, his email and Google Workspace access were deactivated without notice.

70.    During this period, Defendant Luke also began making public and private representations that Mr. Tan had exited the business for jealous, selfish reasons and that Defendant Luke alone had built Capital Club. These statements were false, and they misrepresented Mr. Tan's contributions while unjustly inflating Defendant Luke's role.

71.    Despite repeated representations that business revenues would be managed transparently and in coordination with CCIL, Defendants diverted and retained substantial income through Capital Club, an entity solely controlled by Defendants Luke and Lara.

72.    In March 2024, $665,760 was transferred out of Capital Club's Bluebanc account to undisclosed recipients. Of that amount, $479,000 was falsely booked as "Due from Owners," despite there being no shareholder loans, no capital contributions, and no legitimate basis for such a classification.

73.    Upon information and belief, these funds were misappropriated by Luke and Lara Theis for their personal benefit. This accounting manipulation not only concealed the true

1  destination of nearly half a million dollars, but also exemplifies a deliberate scheme to siphon

2  company assets into personal accounts under the guise of owner receivables.

3      74.    By August 2024, the "Owner's Capital" account on Capital Club's balance sheet

4  had ballooned to $990,000, even though no new equity investment had been made.

5      75.    Simultaneously, Capital Club's stated liabilities dropped from $1.16 million to just

6  $434 in just three months, suggesting intentional manipulation of internal records to misrepresent

7  the financial health of the business and obscure the true flow of funds.

8          **Defendants Luke and Lara's Ongoing Concealment and Misconduct.**

9      76.    To this day, Defendants Luke and Lara continue to operate Capital Club and related

10  entities while denying Mr. Tan any access to records, communications, or financial distributions.

11  They have used numerous bank accounts and financial platforms, including Payoneer, Wise,

12  Merrill Lynch, and cryptocurrency wallets, to move funds in ways that are difficult to trace.

13      77.    On June 6, 2025, Defendant Lara sent financial statements that purported to reflect

14  company operations. A forensic review revealed glaring anomalies, including untraceable

15  transfers, internal inconsistencies, and circular fund movements. The audit identified a pattern of

16  conduct indicating deliberate misappropriation, obfuscation, and asset shielding by both

17  Defendants.

18      78.    This sustained course of conduct has deprived Mr. Tan of his ownership interest,

19  return on investment, and rightful control over the business he substantially helped create and

20  grow.

21      79.    Mr. Tan now brings this action to hold Defendants accountable for their fraudulent

22  inducement, conversion of funds, breach of fiduciary duties, and related wrongful conduct.

23          **COUNT I—FRAUDULENT INDUCEMENT.**

24      80.    All of the allegations contained within the paragraphs above and below are hereby

25  incorporated by reference as if fully set out herein.

26      81.    Defendants made false representations of material fact, specifically, repeated

27  assurances that they intended to execute a formal buyout agreement for Plaintiff's interest in

28  Capital Club.

82.    Defendants made these representations with knowledge of their falsity or reckless disregard for their truth. Defendants intended Plaintiff rely on these misrepresentations to induce Plaintiff to transfer complete operational control of the business without compensation.

83.    Plaintiff reasonably and justifiably relied on these representations by relinquishing control, and as a result, suffered significant damages, including loss of business interests, equity ownership, and revenue, and reputational damage from Defendant Luke's false public statements about Plaintiff's exit.

84.    Defendant Luke delayed execution of a written buyout agreement for nearly eight months while continuing to extract control of the business. Communications reflect that Plaintiff and his team spent extensive time starting in August 2024 preparing and organizing business assets for handover under the express understanding that Defendant Luke would execute the promised buyout and compensate Plaintiff in full for his equity, systems, and years of operational know-how.

85.    For months, Defendant Luke repeatedly stated that his attorneys were working on what should have been a simple settlement agreement, despite having no intention to honor the deal or present terms.

86.    Plaintiff transferred all operational systems, including Stripe accounts, backend software, and even 311,384 user records, under the belief that the buyout would proceed in good faith.

87.    However, Defendants never intended to complete the buyout. The false promises were a pretext to consolidate control, redirect the company's revenues, and exclude Plaintiff from ownership and profits while continuing to exploit the systems Plaintiff had built.

88.    As a direct result, Plaintiff suffered substantial harm, including loss of equity, revenue, control over the business, and even professional damage from defamatory public statements that he had abruptly exited the business voluntarily for selfish pursuits.

**COUNT II—CONVERSION**

89.    All of the allegations contained within the paragraphs above and below are hereby incorporated by reference as if fully set out herein.

90.     Plaintiff has a rightful ownership interest in the revenue, business assets and infrastructure of Capital Club. This included payment systems, customer lists, internal content, and intellectual property. Plus, all revenues were to be processed through CCIL, the Hong Kong-based parent 100% owned by Plaintiff.

91.     Defendants wrongfully exercised dominion and control over these business assets, excluding Plaintiff from both financial distributions and access to company systems.

92.     On September 8, 2024, Defendant Lara unilaterally removed Plaintiff from admin access to core systems. By November, Plaintiff was locked out of all business communications and operational platforms.

93.     Defendants' actions were unauthorized and violated the expectations of shared ownership.

94.     An internal audit of Capital Club LLC's financial records revealed systematic and deliberate mismanagement.

95.     Documents from the Bluebanc account reveal that Defendants transferred over $665,000 out to unidentified recipients. In March 2024, Defendants' entry for "Due from Owners" totaling $479,000 also strongly suggests misappropriation.

96.     The audit revealed that Defendants executed over $450,000+ in multiple transfers from Capital Club to a GoLance account, without any legitimate business purpose or any notification to Plaintiff as a 50/50 business partner, as these transactions were entirely absent from the Quickbooks accounting system.

97.     The audit also identified transactions through a Regions Bank account that was not actively in operational use, raising red flags about hidden banking channels.

98.     These repetitive and untraceable movements suggest an intent to obscure the true destination and flow of funds and to evade financial scrutiny.

99.     These transactions occurred while the parties were purportedly finalizing a buyout and Plaintiff was transferring operational control in good faith.

100.     None of these transfers were disclosed to Plaintiff, and the lack of transparency, combined with the medium of transfer, strongly suggests that Defendants sought to conceal assets

1 and prevent Plaintiff from recovering what he was owed.

2      101.    Capital Club LLC still continued collecting millions in revenue, even though it was

3 obligated to remit earnings to CCIL. This redirection of revenue constituted unlawful conversion.

4      102.    Plaintiff has been severely deprived of his rightful property, equity, and earnings,

5 causing significant damages.

6 **COUNT III—BREACH OF FIDUCIARY DUTY OF CARE**

7      103.    All of the allegations contained within the paragraphs above and below are hereby

8 incorporated by reference as if fully set out herein.

9      104.    A fiduciary relationship existed between Plaintiff and Defendant Luke by virtue of

10 their partnership in Capital Club and joint ownership of the business and because Plaintiff

11 entrusted Defendant Luke with the exclusive management of Capital, including access to

12 proprietary and relating financial information.

13      105.    As a managing partner, Defendant Luke owed Plaintiff a duty of care to act in good

14 faith and with the diligence, prudence, and attention that a reasonable person would use in similar

15 circumstances.

16      106.    Defendant Luke breached that duty of care by failing to provide accurate financial

17 records, blocking Plaintiff from oversight of financial operations, and allowing untraceable

18 transfers from corporate accounts.

19      107.    An internal audit of Capital Club LLC's financial records revealed Defendants'

20 systematic and deliberate mismanagement, such as the $450,000+ that Defendants transferred

21 from Capital Club to a GoLance account in ten installments of either $30,585 or $50,975 from

22 November 2024 to March 2025, without any apparent business justification or any notification to

23 Plaintiff as a 50/50 business partner, as these transactions were entirely absent from the

24 Quickbooks accounting system.

25      108.    Defendant Luke also failed to ensure proper corporate governance, including

26 refusal to formalize a written buyout agreement or execute any standard procedures associated

27 with business succession.

28      109.    Defendants' mismanagement extended to the centralization of control over all

1    revenue accounts and software platforms without mutual agreement.

2            110.    Defendants Luke and Lara also held control over several business bank accounts

3    and financial tools, including accounts with Payoneer, Bluebanc, and Wise.

4            111.    Defendant Lara's access and oversight extended far beyond a nominal ownership

5    role and contributed to the breakdown of fiduciary governance.

6            112.    Defendants' mismanagement led directly to the exclusion of Plaintiff from the

7    business and the misappropriation of company assets.

8            113.    As a direct result of this breach of the duty of care, Plaintiff has suffered harm,

9    including economic losses, denial of distributions, and reputational damage.

10                    **COUNT IV—BREACH OF FIDUCIARY DUTY OF LOYALTY**

11            114.    All of the allegations contained within the paragraphs above and below are hereby

12    incorporated by reference as if fully set out herein.

13            115.    A fiduciary relationship existed between Plaintiff and Defendant Luke as co-

14    founders and business partners, and because Plaintiff entrusted Defendant Luke with the exclusive

15    management of Capital Club, including access to proprietary and relating financial information.

16            116.    The fiduciary duty of loyalty required Defendant Luke to avoid conflicts of interest

17    and to refrain from self-dealing or engaging in conduct that would benefit himself to the detriment

18    of Plaintiff.

19            117.    Defendant Luke blatantly violated that duty by launching a directly competing

20    business, Gem Hunters, using infrastructure paid for by Plaintiff through CCIL, including

21    proprietary systems, internal team members, and access to the very customer database and

22    operational playbooks that powered Capital Club's growth.

23            118.    Without consent or compensation, Defendant Luke repurposed Capital Club's

24    311,384-member lead list, internal resources, and confidential business assets to enrich himself at

25    the expense of the company he was duty-bound to serve.

26            119.    Defendant Luke also exploited the multi-platform social media following and

27    global audience reach that Plaintiff had built for him through Capital Club's resources, using this

28    influence to advance his competing venture and personal brand without sharing the benefits with

1    Plaintiff.

2    120.    Upon information and belief, Gem Hunters has generated and thus, diverted,

3    between $10 million and $15 million in subscription revenue that should have belonged to Capital

4    Club.

5    121.    Defendant Luke also hired key personnel from Capital Club to staff his new venture

6    and redirected platform functionality to his competing business. He concealed these plans while

7    continuing to represent that a buyout would proceed.

8    122.    These acts were not only disloyal but also constituted self-dealing and the usurping

9    of corporate opportunities meant for Capital Club.

10    123.    Defendants' other acts of self-dealing during the supposed buyout talks were the

11    suspicious transactions of over a million dollars through Defendants' own GoLance accounts and

12    Regions Bank account, including direct deposits to Defendant Luke's own name, all of which were

13    undisclosed to Plaintiff.

14    124.    Additionally, Defendants charged over $348,000 in personal lifestyle and

15    entertainment expenses to company accounts, including luxury travel, dining, and branded

16    personal brand development unrelated to legitimate company operations.

17    125.    Defendants improperly categorized these expenses as business costs and paid for

18    them with company funds.

19    126.    Defendants used Capital Club resources to underwrite personal lifestyles, in direct

20    violation of their fiduciary duties and at Plaintiff's expense.

21    127.    Plaintiff has suffered damages in the form of millions of dollars of lost revenue,

22    diluted brand equity, and foregone profits that Defendants captured for themselves.

23    **COUNT V—UNJUST ENRICHMENT**

24    128.    All of the allegations contained within the paragraphs above and below are hereby

25    incorporated by reference as if fully set out herein.

26    129.    Defendants received substantial financial and strategic benefits from Plaintiff's

27    investments and operational contributions.

28    130.    This includes nearly $4.2 million in total expenditures by Plaintiff, including

1  payroll, talent recruitment, travel, event production, software/tech infrastructure, paid advertising,

2  marketing, and personal brand development for Defendant Luke, including videography, content

3  production, and social media growth.

4       131.    At all times, Defendants accepted these benefits with the explicit or implied

5  understanding that they were part of a joint business venture or in furtherance of shared enterprise

6  growth. Defendants did not object, repay, or reject these contributions at the time they were made.

7       132.    This includes over $348,000 in personal credit card expenses paid by CCIL, linked

8  directly to Defendants Luke and Lara and their assistant, including luxury travel, restaurant bills,

9  and branded personal video content.

10       133.    Yet having accepted and consumed those investments, Defendants subsequently

11  excluded Plaintiff from the business, repudiated any ownership entitlement, and retained the full

12  upside of the venture and its derivative projects (including Gem Hunters), built on the very systems

13  and capital Plaintiff provided.

14       134.    Retaining the full value of those benefits while cutting Plaintiff out of ownership

15  and denying any payment creates a textbook case for unjust enrichment.

16       135.    Defendants have enriched themselves with profits derived from business

17  infrastructure and user bases built with Plaintiff's funding and labor.

18       136.    It would be inequitable and unconscionable to allow Defendants to retain the

19  benefit of Plaintiff's work without restitution.

20  **COUNT VI—CIVIL CONSPIRACY**

21       137.    All of the allegations contained within the paragraphs above and below are hereby

22  incorporated by reference as if fully set out herein.

23       138.    Defendants Luke and Lara jointly engaged in a coordinated and deliberate scheme

24  to deprive Plaintiff of his financial and operational interest in Capital Club.

25       139.    Defendant Lara acted not merely as the nominee owner of the LLC but took

26  affirmative actions, such as changing administrative credentials, instructing staff to exclude

27  Plaintiff from internal channels, and overseeing bank accounts.

28       140.    Defendant Lara also held control over several business bank accounts and financial

1    tools, including accounts with Payoneer, Bluebanc, and Wise, through which substantial corporate

2    funds were moved without Plaintiff's knowledge or consent.

3         141.    By using her name and authority to centralize financial control and deny Plaintiff

4    transparency, Defendant Lara became a critical participant in the exclusion scheme.

5         142.    Together, Defendants coordinated the concealment of assets, including the routing

6    of revenue through crypto wallets, unauthorized and undisclosed third-party accounts, and LLCs

7    that had no formal role in the company's original structure.

8         143.    They executed back-to-back same-day transfers between GoLance accounts to

9    move over $450,000 while representing to Plaintiff that a buyout was still in progress.

10        144.    Defendant Luke compounded this deception by making knowingly false public

11   statements that Plaintiff had "abandoned" the business to "pursue meme coin trading," which was

12   a fabricated narrative designed to deflect scrutiny from the internal takeover, and to minimize

13   Plaintiff's contributions in the eyes of customers, partners, and contractors.

14        145.    As a result of this conspiracy, Plaintiff lost access to over $4 million in value and

15   suffered reputational and economic damage.

16        146.    Defendants are jointly and severally liable for the harm caused to Plaintiff as they

17   acted in concert, with shared intent and mutual benefit.

18              **WHEREFORE**, Plaintiff requests that this Court enter judgment against

19   Defendants as follows, for:

20        A.      Compensatory damages, including but not limited to Plaintiff's rightful interest in

21   profits, revenues, diverted funds, and equity value derived from Capital Club and any successor or

22   derivative ventures (including but not limited to Gem Hunters) wrongfully withheld or

23   misappropriated by Defendants;

24        B.      Punitive and exemplary damages, for Defendants' willful, malicious, fraudulent,

25   oppressive, and egregious conduct, undertaken with conscious disregard for Plaintiff's rights, to

26   deter similar misconduct and punish intentional abuse of trust and equity;

27        C.      Injunctive relief, including both preliminary and permanent injunctions, to prevent

28   Defendants and their agents, affiliates, or nominees from further transferring, concealing,

dissipating, or otherwise disposing of any funds, property, or assets related to the business or Plaintiff's interests;

D.    Constructive trust, imposed over all funds, assets, accounts, cryptocurrency holdings, business revenues, or any other property obtained by Defendants as a result of their wrongful conduct;

E.    Forensic accounting, requiring a full and complete accounting of all financial transactions, distributions, payments, reimbursements, transfers, asset holdings, cryptocurrency movements, third-party transfers, and equity allocations related to Capital Club LLC, Gem Hunters, DBH Digital LLC, CC X LLC, or otherwise traceable to Defendants;

F.    Turnover and repatriation orders, requiring the return of all funds, assets, or property rightfully belonging to Plaintiff that have been wrongfully withheld, transferred, or concealed by Defendants;

G.    Plaintiff's reasonable attorneys' fees and court costs, plus prejudgment and post-judgment interest at the statutory rate from the date of judgment until paid;

H.    Such other and further relief as the Court may deem just, proper, and equitable.

RESPECTFULLY SUBMITTED this 11th day of September, 2025.


/s/ Bradley L. Booke
Bradley L. Booke  #5-1676
Box 13160
Jackson, Wyoming 83001
702-241-1631
866-297-4863 Fax
brad.booke@lawbooke.com

**RM WARNER, PLC**

/s/ Raeesabbas Mohamed
Raeesabbas Mohamed, Esq.
Applicant *pro hac vice*
8283 N. Hayden Road Suite 229
Scottsdale, Arizona 85258

*Attorneys for Plaintiff*